# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

LISA POMPA,                                  :        No. 3:21cv1378
            **Plaintiff**                    :
                                             :        (Judge Munley)
                                             :
    v.                                       :
                                             :
ST. LUKE'S HOSPITAL, BLUE                    :
MOUNTAIN HOSPITAL d/b/a ST.                  :
LUKE'S HOSPITAL – GNADEN                     :
HUETTEN CAMPUS OF                            :
LEHIGHTON, PA, and ST. LUKE'S               :
UNIVERSITY HEALTH NETWORK,                   :
            **Defendants**                   :

......................................................................................

## MEMORANDUM

In 2018, the St. Luke's University Health Network acquired a smaller healthcare network of hospitals and other facilities.[1]  In doing so, St. Luke's brought numerous employees at those facilities into their system.  One of those individuals was Plaintiff Lisa Pompa.  Pompa contends that she experienced an age-based hostile work environment after the acquisition, which was perpetuated by her new supervisor.  She reported this individual to St. Luke's human resources department for age discrimination.  St. Luke's then terminated the

---

[1] The defendants in this action include St. Luke's Hospital, Blue Mountain Hospital d/b/a St. Luke's Hospital – Gnaden Huetten Campus of Lehighton, PA and St. Luke's University Health Network.  The court will refer to these defendants collectively as "St. Luke's" in this memorandum.

plaintiff.  Consequently, Pompa claims that St. Luke's did so in retaliation for her age discrimination complaints.

Before the court is a motion for summary judgment filed by St. Luke's. (Doc. 44).  In defending against Pompa's lawsuit, St. Luke's alleges that Pompa acted insubordinately and unethically.  St. Luke's contends that the plaintiff's conduct required the healthcare network to reimburse the Centers for Medicare and Medicaid Services ("CMS") for improper medical billing.

The parties maintain two different narratives based on an extensive summary judgment record.  The question posed by this motion is whether Pompa's narrative is supported by evidence that demonstrates a genuine issue of material fact regarding her claims.  Having been fully briefed and supplemented by the parties, St. Luke's motion for summary judgment is ripe for disposition.

## Background

In January 2018, St. Luke's acquired Blue Mountain Health System ("Blue Mountain"), which was a Carbon County-based healthcare network. (Doc. 45, SOF ¶ 7).[2]  St. Luke's took over responsibility for managing the Gnaden Huetten

---

[2] When possible, the court references St. Luke's statement of material facts ("SOF"), (Doc. 45), for facts that are not disputed in Pompa's counterstatement of material facts ("CSOF"), (Doc. 57).  Otherwise, this memorandum cites to portions of the summary judgment record supplied by the parties.  All facts from the record are construed in a light most favorable to plaintiff as

Memorial Hospital ("Gnaden") in Lehighton along with the Palmerton Hospital ("Palmerton"). (Id.)  Blue Mountain's various healthcare departments thus fell under the St. Luke's umbrella, including its cardiopulmonary rehabilitation programs at Gnaden and Palmerton. (See id. ¶ 10).  At the time of the acquisition, Pompa managed the cardiopulmonary rehabilitation departments at Blue Mountain.  (Doc. 57-1, Pl. Ex. 1, Pl. Dep. 14:24–15:6).

Cardiopulmonary rehabilitation involves different components.  (Id. 16:2-16).  Relevant to this case, Pompa described Blue Mountain's model of treatment as focusing on physical therapy components. (Id., 16:2-16, 55:24–56:6, 74:23–75:1).   St. Luke's uses a different cardiopulmonary rehabilitation model.  Their program does not operate through a physical therapy department. (Doc. 45-3, Def. Ex. B, W. Merkert Dep. 55:12-56:1).

As for the Blue Mountain model of treatment, Pompa testified that she helped create that system's cardiopulmonary rehabilitation program at Gnaden in 1993. (Doc. 57-1, Pl. Ex. 1, Pl. Dep. 13:5–14:7).  For many years, Pompa reported to Gary Higgins, the program director, and Dr. William Markson, the medical director. (Id., 13:23–14:7).  She also worked alongside a physical

---

the nonmoving party. See Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 187 (3d Cir. 2015)(citation omitted).

therapist, Mary Fulton, and physical therapist assistants, Linda Rehus and Karen Alboucq. (Id., 14:8-16). Pompa remained in a managerial role when Gnaden became a part of Blue Mountain, and she counted approximately twenty-five (25) years of service in that position when St. Luke's acquired Blue Mountain. (Id., 15:7-13; see also Doc. 57-10, Pl. Ex. 10, Pl. Email to R. Schaller 11/15/2018). All of the above-named individuals involved with cardiopulmonary rehabilitation at Blue Mountain carried over when Gnaden and Palmerton became part of the St. Luke's healthcare network.

In March 2018, St. Luke's management held an introductory meeting with Blue Mountain management and its cardiopulmonary rehabilitation staff. (Doc. 45, SOF ¶ 11). Blue Mountain's president, Terry Purcell, advised Pompa that her job title would remain the same.[3] (Doc. 57-1, Pl. Ex. 1, Pl. Dep. 55:16-23). Per Pompa, she received information that the St. Luke's-Blue Mountain cardiopulmonary rehabilitation program would continue to function under the physical therapy model. (Id. 55:24–56:6). From that meeting, Mary Fulton, the department physical therapist, also believed that she and Pompa would continue providing the same model and modes of therapy after transitioning to St. Luke's.

---

[3] Purcell became "President, SLBM." (See Doc. 45-19, Def. Ex. O, W. Merkert Memo 01/25/2019, ECF p. 3). Presumably this means that Purcell transitioned into the same role at the St. Luke's campuses that were formerly owned by Blue Mountain. Hereinafter, the court will hereinafter refer to the facilities involved as "St. Luke's-Blue Mountain."

4

(Doc. 57-2, Pl. Ex. 2, M. Fulton Dep. 119:8–120:1).  According to Pompa's testimony, that model involved the use of physical therapy with both one-on-one ("1:1") and group therapy treatments. (Doc. 57-1, Pl. Ex. 1, Pl. Dep., 16:9-21).

In July 2018, William Merkert became solely responsible for managing the cardiopulmonary rehabilitation departments at the St. Luke's-Blue Mountain campuses. (Doc. 45, SOF ¶ 14).[4]  Merkert is St. Luke's director of cardiopulmonary rehabilitation. (Id. ¶¶ 12–13).  Merkert gave employees the impression that he did not like the physical therapy components of the cardiopulmonary rehabilitation program that carried over from Blue Mountain. (See e.g. Doc. 45-21, J. Stehman Interview of J. Graver).

As discussed in this memorandum, Pompa alleges that Merkert harassed her and discriminated against her based on her age.  Based on a cascading series of interactions with Merkert and his alleged differential treatment of the plaintiff versus younger workers, Pompa asserts hostile work environment claims against St. Luke's pursuant to the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, et seq. ("ADEA") and the Pennsylvania Human Relations Act, 73 Pa. Stat. §§ 951, et seq. ("PHRA"). (Doc. 1, Compl., Counts III and IV).

---

[4] According to Merkert's testimony, the comparable program director from Blue Mountain, Gary Higgins, continued with St. Luke's during the transition period in a "unique situation" before he "stepped aside and retired." (Doc. 45-3, Def. Ex. B., W. Merkert Dep. 17:5-16).

Pompa also maintains retaliation claims under these statutes. (Id., Counts I and II).  Based on the March 2018 meeting referenced above, Pompa operated under the impression that she would be managing the cardiopulmonary rehabilitation program at St. Luke's-Blue Mountain "in conjunction" with Merkert under the previous physical therapy model of care, which included use of 1:1 therapy. (Doc. 45-25, Def. Ex. U, L. Pompa Email, 08/28/2018, ECF p. 2-3).  On August 2, 2018, however, Merkert emailed Pompa and Mary Fulton and stated: "By design of ALL of our facilities, we provide group exercise." (Doc. 45-24, Def. Ex. U).  On the other hand, Merkert also indicated that "there may be a necessity for a highly acute patient to receive 1:1 care for a few sessions…but this should only be used in special situations and should not be the choice for daily rehab." (Id.)

St. Luke's defenses in this action relate to Pompa's continued use of 1:1 therapy and the insurance billing for such therapy.  Pompa concedes that she and Merkert "at times disagreed as to the use of a certain billing code used for pulmonary therapy." (Doc. 57, CSOF ¶ 36).  The 1:1 therapy billing code in question is G0238.  St. Luke's takes the position that G0239, a different billing code for group therapy, was the only one appropriate for the care provided by the plaintiff.

6

On August 24, 2018, Merkert emailed Pompa again, but did not include Fulton on the message. (Doc. 45-25, Def. Ex. U, ECF p. 3-4). Merkert indicated:

> Lisa,
>
> We discussed phasing out all 1:1 pulmonary rehab appointments at both campuses...
>
> - You were instructed to phase out ALL G0238 charges.
>   - Granted, I did say there may be a time when it is warranted for a true 1:1 with high acuity.
>
>   - The example below [screenshot omitted] does not qualify for 1:1
>
> It is not my intent to micromanage but it is imperative that we are 100% ethical in our performance.
>
> From today forward, please contact me for approval to use G0238...
>      G0239 should be used for all non-COPD patients.
>
> I am very aware that we receive a higher payment for G0238 but by the nature of our programs, we are providing group exercise.

(Id. (formatting modified)).

On August 28, 2018, Pompa responded to Merkert's email. (Doc. 57-17, Pl. Ex. 17). In the email, Pompa advocated for the physical therapy model of care and billing practices that she used when treating patients with Blue Mountain, including 1:1 therapy. (Id.) Pompa explained that certain patients required 1:1 care based on their diagnoses, such as those awaiting lung transplants. (Id.)

7

Additionally, Pompa documented other St. Luke's-Blue Mountain transition issues, such as scheduling 1:1 patients, reduction of physical therapy staff by 50%, and matters related to the launch of the Epic electronic health record system in the department. (Id.)  She wrote to Merkert: "Since you have utilized the schedule as shown on Epic, I would kindly remind you as I mentioned to you previously[,] we are having issues with our secretary scheduling patients.  This is a daily challenge and has required daily coaching." (Id.)  She concluded her email: "Perhaps you can consider using these G Codes throughout the network to capture larger revenue...while providing quality of care and remaining in compliance.  It can be done successfully!" (Id.)

In his deposition, Merkert did not recall responding to Pompa's email. (Doc. 57-5, Pl. Ex. 5. W. Merkert Dep. 53:17–54:2).  He later told a St. Luke's human resources director that he should have placed Pompa on a corrective action plan at that time. (Doc. 57-21, Pl. Ex. 21, J. Stehman Dep. 27:2-18).  Pompa, however, did not receive any written discipline from Merkert or from St. Luke's for sending this email in August 2018.[5]

---

[5] The August 2018 emails between Merkert and Pompa were exchanged as Merkert and other decision-makers determined how the plaintiff fit into the St. Luke's healthcare network. (Doc. 45-15, Def. Ex. K; Doc. 45-16, Def. Ex. L).  As of August 15, 2018, Merkert believed that Pompa should retain her manager title. (Doc. 45-15).  On August 23, 2018, Merkert also emailed Terry Purcell, the St. Luke's-Blue Mountain president, indicating that he was "trying to justify the position[.]" (Doc. 45-16).  Pompa sent the above email to Merkert on August 28,

In October 2018, Merkert and other St. Luke's decision-makers formally stripped Pompa of her managerial title. (Doc. 57-5, Pl. Ex. 5. W. Merkert Dep. 84:5-25).   St. Luke's changed Pompa's title to physical therapy assistant. (Id.) She no longer provided direct oversight of other department employees. (Id. 24:16–25:4).  St. Luke's also changed the manner of Pompa's compensation from salaried to hourly.  Although St. Luke's preserved her pay rate, Pompa's new position was "red-circled," meaning she could not receive any raises. (Doc. 57-9, Pl. Ex. 9. S. Goral Dep. 21:13–22:19).  In this action, Pompa asserts that Merkert treated her poorly based on her age and intentionally created various issues to force her resignation, including the title and pay changes.

Pompa did not resign.  Instead, on November 15, 2018, Pompa reported Merkert to a senior vice president in St. Luke's human resources department. (Doc. 57-10, Pl. Ex. 10, L. Pompa Email to R. Schaller 11/15/2018).  Pompa accused Merkert of age discrimination and alleged that he created a hostile work environment.  She copied an employment law attorney on her message. (Id.)

---

2018.  The next day, on August 29, 2018, Merkert met with Purcell. (Doc. 57-6, Pl. Ex. 6, T. Purcell Email).  Following the meeting, Purcell emailed William Moyer (another St. Luke's president) stating that Merkert was "concerned about [Pompa] and does not want her to be a manager.  He is going to make her a [physical therapy assistant] or exercise physiologist and he will manage our program.  She will not take this well but it is the right thing to do." (Id.)

9

That St. Luke's executive assigned a human resources director, Jennifer Stehman, to investigate. (Doc. 45, SOF ¶ 103). Stehman interviewed Pompa first, on November 20, 2018. (Doc. 45-27, Def. Ex. W. J. Stehman Report, 0001489). From that initial interview, Stehman concluded that Pompa "was exceptionally angry about the Blue Mountain/St. Luke's transition, specifically that she was no longer the Cardiac Rehab Manager, and that she feels extreme hostility towards Bill Merkert, who she blames for loss of her management role." (Id.) Nonetheless, Stehman also asked Pompa to send her "a detailed statement about interactions with Bill Merkert, making sure to list dates, times, witnesses, etc." (Id.)

Stehman interviewed Merkert on November 21, 2018, providing him with a copy of Pompa's allegations. (Id.; Doc. 57-21, Pl. Ex. 21 J. Stehman Dep. 22:20-23:20). Merkert then used the interview with Stehman as an opportunity to present his issues with Pompa as an employee, including their differing views about billing codes. (Doc. 45-27, Def. Ex. W. J. Stehman Report, 0001489). A week after the interview, on November 28, 2018, Merkert emailed Erin Witkosky in St. Luke's compliance department for guidance regarding the use of the G0238 code at St. Luke's-Blue Mountain. (Doc. 45-19, Def. Ex. O, W. Merkert Memo 01/25/2019). At that time, Witkosky served as St. Luke's manager of

network compliance. (Doc. 45-12, Def. Exh. H., E. Witkosky Dep. 9:9-24).  From

Merkert's request, Witkosky conducted an audit of Pompa's department. (Id.

12:14-24).

On December 4, 2018, and prompted by Stehman in human resources,

Pompa emailed a detailed memorandum describing numerous instances of

Merkert's allegedly discriminatory conduct.  (Doc. 45-22, Def. Ex. R).  Pompa

also copied her attorney on her submission to St. Luke's. (Id.)  Stehman then

shared a copy of Pompa's second written complaint with Merkert. (Doc. 57-5, Pl.

Ex. 5, W. Merkert Dep. 126:14–127:19).  As of December 4, 2018, Merkert and

Witkosky had communicated about Witkosky performing random reviews of

Pompa's department for use of the G0238 code. (Doc. 45-12, Def. Exh. H., E.

Witsosky Dep. 40:6–41:9).  Also as of December 4, 2018, Merkert had advised

Stehman in human resources that Witkosky would be randomly reviewing

Pompa's department. (Id.)

After Pompa submitted the more-detailed complaint on December 4, 2018,

she alleges that her situation at work rapidly worsened.  On December 17, 2024,

Merkert emailed records and screenshots to the network's HR and compliance

departments, which St. Luke's uses in this litigation to argue that Pompa was

actively insubordinate regarding patient billing. (Doc. 45-19, Def. Ex. BB, W. Merkert Email 012/17/2018).

Specifically, on December 13, 2018, Pompa treated a pulmonary rehabilitation patient and inputted the charge using G0238, the 1:1 therapy code. (Doc. 45, SOF ¶ 125). Witkosky caught use of the code on that same date and emailed Merkert. (Doc. 45-28, Def. Exh. X., E. Witkosky Email 12/13/2018, 0001324). On December 14, 2018, Merkert changed the charge code to G0239, the group therapy code. (Doc. 45, SOF ¶ 129). After a phone call from Merkert, the details of which the parties dispute, Pompa then changed the billing code back to G0238 for 1:1 therapy, which she asserts was a proper correction. (Doc. 57-1, Pl. Dep, 155:1–159:15).

Merkert reported the billing code changes to Stehman in St. Luke's human resources department and Witkosky in St. Luke's compliance department. (Doc. 45-19, Def. Ex. BB, W. Merkert Email 12/17/2018). He accused Pompa of "direct insubordination" and indicated that the plaintiff's conduct "put the hospital's Medicare relationship in jeopardy." (Id.) He concluded his email with the following: "In light of the allegations against me, I greatly appreciate your guidance." (Id.)

The St. Luke's investigation into Pompa's allegations of age discrimination against Merkert thus also involved internal investigation into Merkert's allegations of the plaintiff's insubordination over use of the G0238 billing code and one patient's billing changes.

Stehman and Sylvia Goral, another human resources director, interviewed only one of Pompa's listed witnesses before Merkert sent the above email about billing code changes. (Doc. 45-27, Def. Ex. W. J. Stehman Report, 0001490). Pompa's other longtime co-workers, Mary Fulton, Linda Rehus, and Karen Alboucq were interviewed following Merkert's email. (Id.).  Ultimately, Merkert and Goral suspended Pompa on December 20, 2018. (Doc. 45-6, Def. Ex. CC). Goral then sent Pompa a letter terminating her employment with an effective date of January 8, 2019.  (Id.)  St. Luke's written reasons for termination included: "Unsatisfactory work performance, refusing to follow the instructions of immediate supervisor…or failure to perform a job assignment, or a reasonable request by a supervisor."  (Id.)

After exhausting her administrative remedies, Pompa filed this action against St. Luke's pursuant to the ADEA and PHRA. (Doc. 1).  Pompa's complaint asserts the following claims: Count I – ADEA retaliation; Count II –

PHRA retaliation; <u>Count III</u> – ADEA hostile work environment; and <u>Count IV</u> – PHRA hostile work environment.

Witkosky conducted an audit of St. Luke's-Blue Mountain's use of the G0238 billing code after Merkert's November 28, 2018 email. (Doc. 45, SOF ¶ 113).  Witkosky determined that Pompa used the G0238 billing code on 34 occasions and that Mary Fulton used the code on 58 occasions. (Doc. 45-12, Def. Ex. H. E. Witkosky Dep. 86:1–87:14).  As a result of the audit, St. Luke's decided to pay CMS $10,372.99 as a reimbursement for claims between June 23, 2018 and November 30, 2018. (<u>Id.</u> 117:5–119:13).  Fulton testified that she had used the G0238 billing code on the patient involved in the present dispute and assessed that patient as a candidate for 1:1 therapy. (Doc. 57-2, Pl. Ex. 2, M. Fulton Dep. 44:13–45:16, 60:16–61:16).  Fulton also testified that the patient's insurance provider approved 1:1 therapy for thirty-six (36) sessions and that "you would never change billing midway." (<u>Id.</u>)  Merkert ultimately promoted Mary Fulton to a regional coordinator position for St. Luke's in 2020 or 2021. (Doc. 45-3, Def. Ex. B, W. Merkert Dep. 17:17-19:18).

St. Luke's, on the other hand, asserted four (4) counterclaims against Pompa in this litigation, alleging wrongful use of the G0238 billing code by the plaintiff. (Doc. 14, Am. Answer, Counterclaims I-IV).    St. Luke's alleged that

Pompa breached her fiduciary duty to St. Luke's, acted with gross negligence, and became unjustly enriched. Those counterclaims were dismissed by the Honorable Malachy E. Mannion in March 2023. (Docs. 34-35).  Subsequently, St. Luke's filed a second amended answer, emphasizing that it suspended and terminated Pompa after she "took her insubordinate conduct to a new level" regarding the G0238 billing code. (Doc. 39 ¶ 75).  St. Luke's now asserts recoupment from Pompa as an affirmative defense. (Id. p. 47).

By the parties' accounts, this case required extensive fact and expert discovery. (Doc. 52, Def. Br. in Supp. at 9).  Following the close of discovery, St. Luke's filed the instant motion for summary judgment, which brings this case to its present posture.

**Jurisdiction**

Because this case is brought pursuant to the ADEA, the court has jurisdiction pursuant to 28 U.S.C. § 1331. ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."). The court has supplemental jurisdiction over plaintiff's PHRA claims pursuant to 28 U.S.C. § 1367(a). ("In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within

such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.").

**Standard of Review**

St. Luke's has filed a motion for summary judgment seeking dismissal of this action with prejudice.  Granting summary judgment is proper " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.' " See Knabe v. Boury Corp., 114 F.3d 407, 410 n. 4 (3d Cir. 1997) (quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir.1990).  The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson,

16

477 U.S. at 248.  A fact is material when it might affect the outcome of the suit under the governing law. Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

"In employment discrimination cases, the summary judgment standard is 'applied with added rigor' because 'intent and credibility are crucial issues.' " Walden v. Saint Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004)(quoting Stewart v. Rutgers, The State Univ., 120 F.3d 426, 431 (3d Cir. 1997)). Moreover:

> Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this is clearly a factual question, summary judgment is in fact rarely appropriate in this type of case. Simply by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment.

17

<u>Marzano v. Computer Sci. Corp. Inc.</u>, 91 F.3d 497, 509–10 (3d Cir. 1996)(internal quotation marks, citation, and explanatory parentheticals omitted).

**Analysis**

   **1. Judicial Estoppel**

   Prior to review of any facts relative to Pompa's ADEA/PHRA hostile work environment and retaliation claims, the court must resolve a dispute between the parties that resulted in an additional round of briefing. Specifically, St. Luke's seeks the application of judicial estoppel and dismissal of Pompa's retaliation claim. (Doc. 61, Def. Reply Br. at 14-17; Doc. 71, Def. Sur-Sur Reply Br. at 1-2)).

   This issue arose after St. Luke's devoted approximately twelve (12) pages of its brief in support arguing against claims that do not appear on the face of Pompa's complaint, that is, any allegation that St. Luke's terminated the plaintiff because of her age. (Doc. 52 at 22-34). The plaintiff indicated in her brief in opposition that she "does <u>not</u> contend that St. Luke's suspended or terminated her because of her age." (Doc. 56, Pl. Br. in Opp. at 26 (emphasis in original)). Rather, per Pompa, "she was suspended and discharged in retaliation for engaging in protected activity[.]" (<u>Id.</u>)

   As indicated above, Pompa's complaint includes claims for retaliation pursuant to the ADEA and PHRA and claims for hostile work environment under

these statutes.  Pompa's complaint does not include any claims for age discrimination related to her termination.  Rather, her hostile work environment claims assert that she experienced ongoing age-related harassment and discrimination culminating in her title and pay changes. (Doc. 1, Compl. ¶¶ 167–189).  Pompa's complaint relates her suspension and termination to employer retaliation for the plaintiff's internal report of age-related harassment and discrimination. (Id. ¶¶ 137–166).  Nonetheless, St. Luke's argues that Pompa "is playing fast and loose" with her legal theories because she asserted in her Pennsylvania Human Relations Commission ("PHRC") complaint that St. Luke's terminated her in retaliation for reporting age discrimination by Merkert *and* because of her age.   (Doc, 61-1, Def. Ex. EE, ECF p. 16).

Pursuant to the doctrine of judicial estoppel, a plaintiff who has obtained relief from an adversary by asserting and offering proof to support one position, will not be heard later in the same court to contradict herself to establish a second claim inconsistent with her earlier contention against the same adversary. See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp., 337 F.3d 314, 319 (3d Cir. 2003)(citing Scarano v. Central R. Co. of N.J., 203 F.2d 510 (3rd Cir. 1953)).  The Third Circuit Court of Appeals has identified certain criteria

for determining when seemingly inconsistent litigation stances justify the application of judicial estoppel:

> First, the party to be estopped must have taken two positions that are *irreconcilably* inconsistent. Second, judicial estoppel is unwarranted unless the party *changed his or her position "in bad faith* –i.e., with intent to play fast and loose with the court." Finally, a district court may not employ judicial estoppel unless it is "tailored to address the harm identified" and *no lesser sanction would adequately remedy the damage* done by the litigant's misconduct.

Id. (quoting Montrose Med. Grp. Participating Sav. Plan v. Bulger, 243 F.3d 773, 779–80 (3d Cir. 2001))(emphasis in original).

Pompa's positions are not irreconcilably inconsistent and will not be judicially estopped.  She alleged in both the PHRC complaint and the complaint in this action that St. Luke's retaliated against her for reporting age discrimination by her supervisor.  Pompa has simply removed two potential causes of action from the instant case.  That is, her civil complaint only asserts ADEA/PHRA retaliation and hostile work environment claims.  She does not allege any claims for direct age discrimination related to her termination.

Under the law, Pompa may proceed with different claims based on the different adverse actions she allegedly experienced, including her allegations of ongoing age-related harassment from Merkert.  She may assert that she experienced intentional age discrimination as part of her hostile work

20

environment claim to include multiple events culminating in her title and pay

changes.  She may, at the same time, assert that she experienced retaliation in

the form of suspension and termination for reporting to St. Luke's her good faith

belief that Merkert was discriminating against her based on her age.[6]  After all,

retaliation for complaining about age discrimination is discrimination based on

age. See Gomez-Perez v. Potter, 553 U.S. 474, 488 (2008).  Thus, any change

in Pompa's claims between the administrative level and this action is

inconsequential.[7]  Pompa is not playing fast and loose with the courts. Judicial

estoppel will not be applied here.

---

[6] As discussed in Section 3 of this memorandum, St. Luke's does not challenge whether Pompa's complaints of age discrimination constituted protected activity for the purposes of her retaliation claim.  (Doc. 52, Def. Br. in Supp. at 11).

[7] Additionally, "judicial estoppel, 'generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.' " New Hampshire v. Maine, 532 U.S. 742, 749 (2001)(quoting Pegream v. Herdich, 530 U.S. 211, 227, n. 8 (2000)).  Pompa did not prevail or obtain relief from the PHRC or from the Equal Employment Opportunity Commission ("EEOC") regarding any age discrimination claim related to her termination.  Instead, the EEOC issued her a right-to-sue letter. (Doc. 1, Compl, Ex. A, ECF p. 39).  The PHRC then advised Pompa that it was closing her case at an administrative level after she filed this action. (Doc. 68, Ex. A, ECF p. 8-11).

## 2. Hostile Work Environment

Turning now to Pompa's claims in this action, she contends that she experienced an age-based hostile work environment.[8]  To succeed on an age-based hostile work environment claim, the plaintiff must demonstrate that: 1) she suffered intentional discrimination because of her age; 2) the discrimination was severe or pervasive; 3) the discrimination detrimentally affected the plaintiff; 4) the discrimination would detrimentally affect a reasonable person in like circumstances; and 5) the existence of *respondeat superior* liability.[9]  See Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013)(citations omitted).

---

[8] The Third Circuit Court of Appeals has not definitively stated whether a hostile work environment claim may be advanced pursuant to the ADEA. See Hildebrand v. Allegheny Cnty., 923 F.3d 128, 137 (3d Cir. 2019)(determining that a plaintiff plausibly stated an ADEA claim based on allegations of a hostile work environment when reviewing meritoriousness as part of a sanctions analysis); see also Adams v. City of Newark, 747 F. Supp. 3d 721, 731 (D.N.J. 2024)(citing Howell v. Millersville Univ. of Pennsylvania, 749 F. App'x 130 (3d Cir. 2018); Culler v. Sec'y of U.S. Veterans Affs., 507 F. App'x 246 (3d Cir. 2012)).  In Howell, a Third Circuit panel assumed, without deciding, that the ADEA permits hostile work environment claims. 749 F. App'x at 135.

Pennsylvania's intermediate appellate courts recognize PHRA age-based hostile work environment claims and rely upon Title VII jurisprudence. See Renna v. PPL Elec. Utilities, Inc., 207 A.3d 355, 368 (Pa. Super. Ct. 2019); Deter v. Borough of Sykesville, No. 500 C.D. 2019, 2020 WL 973341, at *1 (Pa. Commw. Ct. Feb. 28, 2020).  Moreover, the provision of the ADEA relevant to this case, 29 U.S.C. § 623(a)(1) is not specifically different than the PHRA equivalent, 43 PA. STAT. § 955(a).  See Willis v. UPMC Children's Hosp. of Pittsburgh, 808 F.3d 638, 643 & n. 4 (3d Cir. 2015)(citations omitted).  The court will thus assume the legal viability of Pompa's ADEA hostile work environment claim and refer to Title VII caselaw in addressing St. Luke's summary judgment arguments.  The court will also address the ADEA and PHRA hostile work environment claims in a combined analysis.

[9] Title VII and the ADEA are "comparable in many contexts." Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc., 450 F.3d 130, 135, n. 4 (3d Cir. 2006); see also Culler, 507 F.

As to these elements, St. Luke's targets only two in its motion for summary judgment. St. Luke's contends that Pompa did not suffer any intentional discrimination because of her age. St. Luke's also argues that, because plaintiff did not suffer from age discrimination, she cannot demonstrate severe or pervasive age-related harassment. The court will address these issues separately.

### a. Age Discrimination

The ADEA makes it unlawful for an employer to "otherwise discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a). Thus, to prevail on her ADEA hostile work environment claim, Pompa must first demonstrate that she experienced discrimination because of her age. [10] Under the law, a plaintiff making an age discrimination claim survives summary judgment if she has proof that the employer treated other, similarly situated persons not of her protected class more favorably. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

---

App'x at 249 & n. 3. The court thus borrows these elements from Title VII case law to address the plaintiff's ADEA/PHRA hostile work environment claims.

[10] The prohibitions against age discrimination in the ADEA are limited to individuals who are at least forty (40) years of age. 29 U.S.C. § 631(a).

The summary judgment record reflects that Pompa was 53 years old at the time she became a St. Luke's employee in approximately June 2018. (Doc. 45, SOF ¶ 8). Between June 2018 and the date of her termination, Merkert supervised Pompa both when the plaintiff managed the cardiopulmonary rehabilitation department and when she later served as a physical therapist assistant. Per the plaintiff, Merkert favored younger workers, who were rotated into the plaintiff's department after the acquisition and provided those younger workers with different, better treatment.

For example, Pompa worked with a *per diem* exercise physiologist named Julie Williams. (Doc. 45-11, Def. Ex. G., J. Williams Dep. 24:4-15). Williams turned 26 years old in July 2018, around the time Merkert began supervising the plaintiff. (Id. 42:3-6). Pompa testified that, one day, she requested Merkert's assistance with Epic, St. Luke's electronic health record system. (Doc. 57-1, Pl. Ex. 1, Pl. Dep. 76:7–77:2). Williams had created "tip sheets" to help Pompa's office with documentation in Epic. (Id.) In response to Pompa's request for assistance with that system, Merkert allegedly stated about Williams: "I love when she kisses my ass. She'll do anything I ask." (Id.)

Mary Fulton, the department's physical therapist, also recalled Merkert making that statement. (Doc. 57-1, Pl. Ex. 2, M. Fulton Dep. 113:1–114:8).

24

Merkert may have been 52 at the time, (Doc. 45, SOF ¶ 3), but, per Fulton, that

comment demonstrated that Merkert was "immature" and "should not have been

delegated the task he was doing." (Doc. 57-1, Pl. Ex. 2, M. Fulton Dep. 82:4-25).

Fulton added this context:

> With his criticisms and things he stated, how he wanted
> things done, we couldn't understand how all of these
> expectations would be met with the amount of staff and
> time allotted. And he had all of these other employees
> running around doing everything, which we sort of didn't
> feel was correct, and we're like -- and somebody made the
> comment, well, you just -- you have them jumping all over;
> and he just said, yeah, I just love how they kiss my ass.
> And he was laughing.

(Id. 113:7-20).[11]

Furthermore, Merkert's treatment of Pompa regarding the Epic transition is

a substantial component of her argument that Merkert preferred younger workers

in the department.  Pompa and her co-workers required training to use the Epic

system once they became St. Luke's employees. (Doc. 57-1, Pl. Ex. 2, M. Fulton

Dep. 113:25–114:8).  Workers in their 20s and 30s like Williams and others were

brought into Pompa's department to help train them and were identified by Fulton

---

[11] Pompa also testified that Merkert said things like, "I love Julie [Williams], she is like my
daughter.  I even give her some of my clothes to wear." (Doc. 57-11, Pl. Ex. 11, L. Pompa
Memo 12/4/2018, P000166).  Merkert allegedly stated this to Pompa on the day he removed
her management title. (Id.)

as the employees who were "running around" for Merkert. (Id. 113:25–114:17; Doc. 57-1, Pl. Ex. 1, Pl. Dep. 39:4-18; 69:11-19, 74:2:5).  Pompa testified that Merkert would tell her that these "younger co-workers were able to perform this job with no problem, [and] knew what they were doing[,]" while telling the plaintiff she "was like the blind leading the blind."[12] (Doc. 57-1, Pl. Ex. 1, Pl. Dep. 39:4-18; 69:11-19).  Per Pompa, Merkert placed the younger employees "on a pedestal[,]" and told the plaintiff that they were better than her, "better performers," "greater personalities" and that "they could run circles" around her. (Id. 40:8-17).

Pompa also testified that Merkert would schedule Julie Williams to treat physical therapy patients. (Doc. 57-1, Pl. Ex. 1, Pl. Dep. 74:6–75:1).  Per Pompa, because Williams was an exercise physiologist, Williams did not have the degree or license to be treating physical therapy patients. (Id.)  When Pompa advised Merkert that the practice was unethical, Merkert told the plaintiff: "I'm not worried about that." (Id.)  As Pompa indicated in her internal complaint to St. Luke's, Merkert regularly questioned the plaintiff's qualifications and ability to treat patients due to her lack of master's degree. (Doc. 57, Pl. Ex. 11, L. Pompa Memo

---

[12] Linda Rehus and Karen Alboucq worked as *per diem* physical therapist assistants in Pompa's department at St. Luke's and carried over from Blue Mountain.  These individuals are a decade or more older than the plaintiff. (See Doc. 45, SOF ¶¶ 4-5).  At the time, Pompa managed these individuals.

12/04/2018). And as discussed below regarding Pompa's retaliation claims, St. Luke's asserts that the plaintiff acted unethically in treating and billing patients and caused them to terminate her employment.

As another example, Pompa recalled an incident where Merkert yelled at her in front of a patient and his wife. (Id. 83:16–85:5). Per Pompa, Merkert failed to properly convert the cardiopulmonary rehabilitation schedule over to Epic and the department still required some level of paper scheduling. (Id.) According to Pompa, Merkert reprimanded her in a public setting, yelling: "Don't you ever schedule a patient without checking the schedule first." (Id.). On the same date, he allegedly praised Williams in front of Pompa for scheduling in the same manner, stating: "Oh that was great Julie, I'm so glad you were able to do that." (Id.) Pompa further testified that Merkert also granted access for Williams to schedule patients from Epic work queues to obtain new referrals. (Id. 89:23–91:3). Per Pompa, Merkert did not provide the plaintiff with the same access and thus she could not obtain new patients. (Id.; see also Doc. 57, Pl. Ex. 11, L. Pompa Memo 12/04/2018, P000165). Pompa thus has evidence that a jury could use to determine that Merkert discriminated against the plaintiff based on her age by applying different rules and standards to younger workers.[13]

---

[13] Pompa further contends that Merkert deliberately set her up to fail regarding Epic. In June 2018, when Pompa still reported to Gary Higgins, she called Merkert to relay her department's

27

Additionally, for the sake of addressing all the parties' arguments, St.
Luke's argues in its supplemental briefing that Pompa only has her own
testimony to connect the alleged mistreatment to age discrimination. (Doc. 71,
Def. Sur-Sur Reply at 2-3).  For example, Mary Fulton testified that age did not
play a role in Merkert's conduct. (Doc. 57-1, Pl. Ex. 2, M. Fulton Dep. 111:3-6).
The department secretary, Julie Graver, testified that Pompa and Merkert were
like "oil and water" and "just did not get along." (Doc. 45-9, Def. Ex. E, J. Graver
Dep. 31:16-19).  Graver, like Fulton, believed that the issues between the two
were not a matter of age discrimination. (Id. 46:4-14).  She testified that Merkert
treated Pompa differently from the other staff members because the plaintiff
managed the cardiopulmonary rehabilitation department at the time St. Luke's
took over. (Id. 45:6-15).  On the other hand, a *per diem* physical therapy
assistant in Pompa's department at the time, Karen Alboucq, testified that
Merkert's conduct had "undertones" of being age-related and that Merkert

---

statistics and number of procedures for the prior two (2) months. (Doc. 57-11, Pl. Ex. 11, L.
Pompa Memo 12/04/2018, P000162).  Merkert told her: "Soon I won't need you. I will have
Epic, you are disposable." (Id.) Per Pompa, she reported these comments to Higgins. (Id.) Higgins, a Blue Mountain holdover, subsequently retired. (Doc. 57-5, Pl. Ex. 5. W. Merkert
Dep. 17:5-16).   The plaintiff's second, more-detailed complaint to St. Luke's about age
discrimination indicates that St. Luke's scheduled her for Epic training early in the transition
from Blue Mountain, but Merkert removed her, telling her she did not need it. (Doc. 57-11, Pl.
Ex. 11, L. Pompa Memo 12/04/2018, P000160).  Pompa documented numerous events
involving Merkert over the next several months, to include further issues with Epic even after
she received training. (Doc. 57-11, Pl. Ex. 11, L. Pompa Memo 12/04/2018, P000162–166).

favored "the younger girls" in the department once the St. Luke's transition occurred. (Doc. 57-4, Pl. Ex. 4, K. Alboucq Dep. 109:6–110:23, 117:4-118:14).

Regarding the above evidence, St. Luke's argues that Alboucq's deposition testimony should essentially be disregarded at the summary judgment stage because it differs from the account documented by St. Luke's human resources employees when they interviewed Alboucq in December 2018. (Doc. 61, Def. Reply Br. at 4). Like all the individuals named in this memorandum, Alboucq's testimony is subject to a credibility determination. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" Anderson, 477 U.S. at 255. That precludes summary judgment here.

St. Luke's also repeatedly references that Merkert and Pompa were approximately the same age. (Doc. 52, Def. Br. in Supp. at 2, 16, 18). The law, however, does not provide a conclusive presumption that a person in the same age group will not discriminate against members of the same age group. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998); Castaneda v. Partida, 430 U.S. 482, 499 (1977) ("Because of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their

29

group."). Pompa has otherwise provided evidence demonstrating genuine issues of material fact about age discrimination. The closeness of age between Pompa and Merkert is but one fact which must be submitted to a factfinder in order to resolve this issue.

### b. Severe or Pervasive Harassment

Additionally, to prevail on an ADEA hostile work environment claim, a plaintiff must show that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Nat'l. R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116 (2002)(quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)). As for this "severe or pervasive" element, in determining whether an environment is hostile, "a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Mandel, 706 F.3d at 168 (quoting Harris, 510 U.S. at 23). "[T]he resolution of that question is context-specific," Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017), with consideration of the overall scenario, see Qin v. Vertex, Inc., 100 F.4th 458, 471 (3d Cir. 2024).

Additionally," 'conduct must be extreme' to satisfy this standard, so 'simple teasing, offhand comments, and isolated incidents (unless extremely serious)' are inadequate." Mandel, 706 F.3d at 168 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).

As discussed further in the next section, Pompa provided St. Luke's with a detailed memorandum to support her claims of age discrimination against Merkert on December 4, 2018.  Pompa's memorandum documented more than thirty (30) events from the previous six (6) months, indicating various instances in which she believed that Merkert treated her differently from younger co-workers. (Pl. Ex. 11, L. Pompa Memo 12/04/2018).  The court has referred only to some of the matters addressed in that document above.  Furthermore, Pompa testified that Merkert's ongoing conduct wore her down personally and professionally and that she was getting "sick every day by his actions, his words, [and] his treatment[.]" (Doc. 57-1, Pl. Ex. 1, Pl. Dep. 59:24-60:23).

Additionally, Merkert testified that Pompa's age discrimination complaint to human resources caught him "off guard" because he believed that he had a "pretty good relationship" with the plaintiff. (Doc. 45-3, Def. Ex. A, 101:9-18). Pompa has evidence to the contrary beyond her own testimony.  Mary Fulton, the department physical therapist, testified that Merkert would show up, take

31

Pompa out of the treatment area into an office with the door closed. (Doc. 57-1, Pl. Ex. 2, M. Fulton Dep. 71:25–72:18, 74:3-15). Per Fulton: "It would get loud[,]" and Pompa would come out upset.  (Id. 72:3-9).  Pompa, who Fulton described as "a hard ass and not a cryer[,]" would cry once or twice a week after these meetings. (Id. 71:25–72:11).  Merkert held these meetings with Pompa at the end of Pompa's shift on Friday. (Id. 74:7–15).  Per Fulton, Merkert "was continuously rude" to the plaintiff in front of staff and patients. (Id. 79:12-21).

Fulton may not believe that Merkert discriminated against the plaintiff based on her age, but her testimony about the nature of Merkert's conduct corresponds to matters included in Pompa's report of age discrimination to St. Luke's.  (Doc. 57-11, Pl. Ex. 11, L. Pompa Memo 12/04/2018).  A reasonable jury may find Pompa's testimony to be credible.  When reviewing the overall scenario in a light most favorable to Pompa, she has provided sufficient evidence on the issue of whether she experienced severe or pervasive harassment from Merkert to preclude summary judgment on the ADEA/PHRA hostile work environment claims.

### 3. ADEA/PHRA Retaliation

St. Luke's also moves for summary judgment on Pompa's ADEA/PHRA retaliation claims.  The ADEA makes it "unlawful for an employer to discriminate

against any of his employees…because such individual…has opposed any practice made unlawful" by the ADEA. 29 U.S.C. § 623(d).  Similarly, the PHRA makes it unlawful "[f]or any person to discriminate in any manner against any individual because such individual has opposed any practice forbidden by" that statute.  43 Pa. Cons. Stat. § 955(d).  The court will thus address Pompa's retaliation claims in a combined analysis. See Daniels, 776 F.3d at 193.

Here, Pompa claims that she complained of age discrimination and then, in retaliation, St. Luke's suspended her and ultimately terminated her employment. Pompa does not have direct evidence of retaliation, but rather relies upon indirect or circumstantial evidence.  Where a plaintiff relies upon indirect or circumstantial evidence of retaliation, the court applies the three-part burden shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Daniels, 776 F.3d at 193 (citing Fasold v. Justice, 409 F.3d 178, 188 (3d. Cir. 2005)).

Pursuant to that framework:

> a plaintiff asserting a retaliation claim first must establish a prima facie case by showing "(1) [that she engaged in] protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir.2007) (quoting Fogleman v. Mercy Hosp. Inc., 283 F.3d 561, 567–68 (3d Cir.2002)).

> If the plaintiff makes these showings, the burden of production of evidence shifts to the employer to present a legitimate, non-retaliatory reason for having taken the adverse action. Id.
>
> If the employer advances such a reason, the burden shifts back to the plaintiff to demonstrate that "the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id. (quoting [Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006), as amended (Sept. 13, 2006)]).

Daniels, 776 F.3d at 193 (formatting modified).

### a. Pompa's *Prima Facie* Retaliation Case

As for Pompa's initial burden in this matter, St. Luke's concedes the first two elements of the plaintiff's *prima facie* case. That is, St. Luke's does not challenge, for the purposes of this motion, that the plaintiff engaged in protected activity and experienced adverse action after engaging in that protected activity. St. Luke's argues, however, that Pompa cannot demonstrate the third element of her *prima facie* burden, a causal link between her protected activity and her termination. The court disagrees.

In advancing her retaliation claims, Pompa may demonstrate causation two different ways: "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." Lauren W. ex rel.

34

Jean W. v. DeFlaminis, 480 F.3d 259, 267 (3d Cir. 2007)(citing Krouse v. Am.

Sterilizer Co., 126 F.3d 494, 503–04 (3d Cir. 1997); Woodson v. Scott Paper Co.,

109 F.3d 913, 920–21 (3d Cir. 1997)). "In the absence of that proof the plaintiff

must show that from the 'evidence gleaned from the record as a whole' the trier

of the fact should infer causation." Id. (quoting Farrell v. Planters Lifesavers Co.,

206 F.3d 271, 281 (3d Cir. 2000). Additionally, a plaintiff alleging retaliation "has

a lesser causal burden" at the *prima facie* stage and need only "produce

evidence sufficient to raise the inference that her protected activity was the *likely*

*reason* for the adverse employment action." Carvalho-Grevious v. Delaware

State Univ., 851 F.3d 249, 259 (3d Cir. 2017)(citations, quotation marks, and

brackets omitted)(emphasis in original).

Here, Pompa reported age discrimination by Merkert, her supervisor, to St.

Luke's human resources department on November 17, 2018. St. Luke's then

investigated. During that investigation, Merkert reported his issues with Pompa

to human resources and triggered an internal audit of Pompa's department by St.

Luke's compliance staff. At the request of St. Luke's human resources

investigator, Pompa provided a more detailed complaint on December 4, 2018.

St. Luke's investigator shared that complaint with Merkert thereafter. On

December 14, 2018, Merkert then changed a billing code regarding one of

Pompa's patients.  Per the plaintiff, Merkert did so without telling her. Pompa

changed it back the same day, believing it to be her error.  By December 17,

2018, Merkert had discovered the change and reported Pompa to St. Luke's

human resources department.  In the following weeks, St. Luke's suspended and

then terminated Pompa and not Merkert.

Both sides find support in their positions through this timeline.  Critically,

Pompa has advanced evidence capable of raising a reasonable inference that

her protected activity prompted Merkert to engage in conduct designed to cause

St. Luke's to take disciplinary action against the plaintiff and not him.  Under the

law, a pattern of antagonism coupled with timing is sufficient to demonstrate

causation.   Pompa has thus met her *prima facie* burden here.

### b. St. Luke's Legitimate, Non-Retaliatory Reasons

At the second step of the McDonnell Douglas framework, the burden of

production of evidence shifts to the employer to present a legitimate, non-

retaliatory reason for having taken the adverse action. Daniels, 776 F.3d at 193

(quoting Marra, 497 F.3d at 300).  St. Luke's has offered several facially

legitimate reasons for Pompa's suspension and termination.  The court refers to

the written reasons provided in St. Luke's termination letter to the plaintiff:

"Unsatisfactory work performance, refusing to follow the instructions of

36

immediate supervisor…or failure to perform a job assignment, or a reasonable request by a supervisor." (Doc. 45-6, Def. Ex. CC, Termination Ltr.).  In this litigation, St. Luke's also advances that Pompa acted unethically regarding medical billing through use of the G0238 billing code for 1:1 therapy.  To that end, St. Luke's has proffered an expert opinion indicating that reversal of G0238 charges and repayment to CMS were appropriate measures.  (Doc. 62, Report of P. Comoss).  St. Luke's has thus met its burden at the second step.

### c. Pompa's Pretext Case

Since St. Luke's has advanced legitimate, non-retaliatory reasons for Pompa's termination, the burden shifts back to the plaintiff to demonstrate that St. Luke's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.  Daniels, 776 F.3d at 193 (quoting Marra, 497 F.3d at 300).  To defeat summary judgment, Pompa must produce evidence which: "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that [retaliation] was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 762.   At the summary judgment stage, the court considers a broad array of evidence, including: 1) antagonism by the

37

employer; 2) inconsistencies in the reasons the employer gives for its adverse action; and 3) any other evidence suggesting that the employer had a retaliatory animus when taking the adverse action.  Canada v. Samuel Grossi & Sons, Inc., 49 F.4th 340, 347 & n. 44, 349 (3d Cir. 2022).

Although St. Luke's has offered evidence that Pompa's suspension and termination occurred as a legitimate response to workplace insubordination and misconduct, Pompa has responded to the motion for summary judgment with evidence a jury may use to reasonably conclude that Merkert and St. Luke's terminated the plaintiff in retaliation for her protected activity and engaged in extensive efforts to hone and craft its defenses to then-anticipated litigation.

As for the proffered reason that Pompa acted in an insubordinate manner, St. Luke's maintains work rules outlining violations of certain general guidelines, which could result in immediate termination of employment depending upon the seriousness and/or frequency of the offense. (Doc. 45-8, Def. Ex. DD, 0001011). Those general guidelines include "[r]efusing to follow the instructions of an immediate supervisor, manager, director, or other person of authority" and "refusal or failure to perform a job assignment, or a reasonable request by a supervisor[.]" (Id.)  Those guidelines are cited in Pompa's termination letter, which also references Merkert's side of the story regarding the prohibited use of

38

the G0238 billing code and his narrative regarding the plaintiff's changes to a patient's billing on December 14, 2018.. (Doc. 45-8, Def. Ex. CC).

But a reasonable, rational jury can consider Pompa's evidence, including her testimony, and disbelieve any assertion that the plaintiff was insubordinate regarding the G0238 billing code. As for any evidence that Merkert wanted to end use of that code in August 2018, Merkert's own testimony is to the contrary. He testified that Pompa had "a very compelling discussion and thought process" as to why the G0238 code might work at St. Luke's. (Doc. 57-5, Pl. Ex. 5. W. Merkert Dep. 54:3–55:11). He acknowledged that a physical therapy model with 1:1 therapy as implemented at Blue Mountain had potential to continue. (Id. 55:12–56:1). So, in his own words, he was "dragging [his] feet" after August 2018 regarding cessation of the G0238 code. (Id.

Merkert also testified that, from August 2018 to December 2018, he knew that the plaintiff, Mary Fulton, and Linda Rehus were using both the G0238 and G0239 codes. (Id. 62:3-7). He did not take any disciplinary action against Fulton or Rehus. (Id. 62:8-21). As indicated above, Merkert ultimately promoted Fulton despite an audit reflecting that she used the G0238 code more than any other employee during that timeframe. And Rehus retired in the spring of 2019 without incident. (Doc. 57-3, L. Rehus Dep. 10:1–11:2).

39

Unlike with Fulton or Rehus, Merkert took steps that led to Pompa's suspension and termination after she reported him for age discrimination.  Before being provided with Pompa's complaint of discrimination in November 2018, Merkert "didn't want to come in as the big bad wolf and reprimand[] everybody for what they were doing[,]" regarding use of the G0238 code. (Doc. 57-5, Pl. Ex. 5, W. Merkert Dep. 62:12-21).  After Pompa accused him of age discrimination, Merkert chose to trigger a formal internal audit of her department regarding use of the code on November 28, 2018. (Doc. 57-14, Pl. Ex. 14, E. Witkosky Dep. 35:1–37:21, 40:13–41:9).

That brings the court to a discussion of Pompa, Fulton, and Rehus's treatment of a patient, LN. [14]  On September 5, 2018, LN's treating physician diagnosed her with restrictive lung disease and referred her for thirty-six (36) sessions of pulmonary rehabilitation, three times per week. (Doc. 57-25, Pl. Ex. 25, Referral).  On September 25, 2018, LN's insurer sent her a letter regarding that treatment. (Doc. 57-24, Pl. Ex. 24).  The letter, singed by the insurer's medical director, indicated that her treating physician requested approval for services billed under the G0238 code and that the insurer approved such treatment for LN. (Id.)

---

[14] St. Luke's refers to LN by her full name repeatedly in its moving papers.  The court will refer to St. Luke's patient by using her initials.

40

From the inception of LN's treatment at St. Luke's-Blue Mountain, Pompa's department exclusively charged the patient using the G0238 code. (Doc. 45, SOF ¶ 122). On September 25, 2018, Mary Fulton, the department physical therapist assessed LN and created LN's plan of care. (Doc. 57-2, Pl. Ex. 2, M. Fulton Dep. 34:23–35:6). That plan of care included 1:1 therapy. (Id. 58:16–61:16). Fulton's care plan was co-signed by Dr. William Markson, a St. Luke's medical director. (Id.) Per her testimony, Fulton treated LN on September 25, 2018, using 1:1 therapy and billed using the G0238 code. (Id. 41:6–42:16). Fulton also testified that she consistently treated LN with 1:1 therapy and billed using the G0238 code because that is what LN's insurer authorized for the period of treatment. (Id. 53:18–54:23, 58:16–61:16). Fulton, who Merkert eventually promoted to a supervisory role, testified:

> Q. So for 36 visits, 36 sessions, based on the insurance company's authorization, she should have been treated with one-on-one therapy?
>
> A. Correct.
>
> Q. And therefore it should have been billed under G0238 for each session as set forth in the [insurer's] determination?
>
> A. Correct.

(Id. 61:9-16).

But Fulton experienced a medical event on November 26, 2018, and took leave from work. (Id. 58:1-9). There is no evidence that St. Luke's changed Fulton's plan of care for LN from 1:1 therapy to group therapy.

With Fulton on leave, Pompa and Linda Rehus treated LN in December 2018. On December 13, 2018, Pompa treated LN. She used code G0238 and billed for four (4) units. She entered the charge on December 13, 2018 at 1:58 PM. (Doc. 45-30, Def. Ex. Z, E. Witkosky Email 12/19/2018).

That same day, Erin Witkosky in St. Luke's compliance department discovered that the G0238 code had been billed for treatment of LN on December 13, and she notified Merkert of the use of the code. (Doc. 45, SOF ¶ 121). Witkosky's email indicates:

> I noticed that G0238 was billed on 12/13/18 for **[LN]**. I haven't been checking December billing for other patients since you said the G0238 was no longer being used as of 12/1/18, but I wanted to check a random one. Is it possible for you to run a report and see if:
>
> > 1. the code has been used on any other patients in December;
> >
> > 2. the code can be changed before submitted to insurance for all the December patients;
> >
> > 3. **see who used the incorrect code and reeducate** (the 12/13 note isn't in Epic yet).

(Doc. 45-28, Def. Ex. X, ECF p. 4)(formatting modified and emphasis added).

42

Merkert responded to Witkosky the next morning, December 14, 2018 at 7:47 AM, advising that G0238 had been used on five (5) patients.[15] (Id.)  He requested that Witkosky give him a "quick call[.]" (Id.)  At 9:58 AM, Witkosky responded by email:

> Per our discussion, please remove the G0238 charges for those 5 patients in December.  You can change the charge to G0239 if a) the patient has an appropriate diagnosis (no COPD) and b) it is NOT documented "No" to the group session in the note.  Let me know if you have any questions.

(Id., ECF p. 3).

At 10:18 AM, Merkert forwarded the email chain to Jennifer Stehman, the human resources director who was investigating Pompa's complaints of age discrimination against him.  He wrote: "Please see [Witkosky's] email message below.  This is the Pulmonary Rehab charge that [Pompa] blatantly refused to discontinue using.  I will be reversing these charges this morning." (Id.)

At 11:29 AM, Merkert reversed the charge for LN and entered G0239, 1 unit. (Doc. 45-30, Def. Ex. Z, E. Witkosky Email 12/19/2018).  At 11:40 AM,

---

[15] In contrast to the email, Merkert testified that the G0238 code had been used in December 2018 for five (5) patient sessions. (Doc. 57-5, Pl. Ex. 5, W. Merkert Dep. 151:6-20).  Per Merkert: "It could have been five different people…or one or two people." (Id.)  Absent any other evidence, a jury may take Merkert's conflicting positions and reasonably infer that the G0238 code was used exclusively on LN at St. Luke's-Blue Mountain in December 2018.

Merkert called Pompa. (Doc. 45, SOF ¶ 130). Per Merkert, he told Pompa to never use the G0238 code under any circumstances and that he was changing the G0238 charges to G0239. (Doc. 45-3, Def. Ex. B, W. Merkert Dep. 180:19–181:23).

According to Pompa, however, Merkert's words were forward-looking during that conversation and did not reference past treatment. (Doc. 57-1, Pl. Ex. 1, Pl. Dep. 158:7–159:4; see also Pl. Ex. 22, L. Pompa Memo to S. Goral 12/21/2018 ("I received a call from [Merkert] stating, 'no matter what the staffing is he wants to charge for Group Therapy.' Since that time, I have been compliant with scheduling and billing patients for group therapy sessions and not against the directive issued by [Merkert].")). Per Pompa, Merkert did not discuss the correction on December 14, 2018, and did not tell the plaintiff that he changed LN's billing until December 19, 2018. (Doc. 57-1, Pl. Ex. 1, Pl. Dep. 159:5–160:1, 161:14–162:6).

Linda Rehus treated LN on December 14, 2018 with 1:1 therapy between 11:27 AM and 12:10 PM, or during the time that Merkert called the plaintiff. (Doc. 57-3, Pl. Ex. 3, L. Rehus Dep. 33:6–34:14). Per Rehus, no other person was in the gym at the Palmerton campus. (Id.) Rehus also testified that Merkert did not

tell her to stop using the G0238 code until after Pompa was suspended by St. Luke's. (Id. 22:7-23).

After Rehus administered 1:1 therapy to LN, she went in to bill the patient using the G0238 code, because "that was the established procedure for this patient[,]" and how the department "billed this patient time and time again." (Id. 40:6-18). Rehus observed that the most recent charge (December 13) was entered in the system as one unit, not multiple units as G0238 charges were billed. (Id. 42:16-43:21). According to Rehus, she called the plaintiff, who had last treated LN. (Id. 45:1-22). Rehus testified that she told the plaintiff that LN had only been charged one unit for the therapy administered the day before. (Id. 45:23–46:7). Per Rehus, Pompa told her that she would look into it.[16] (Id.)

Based on Rehus's phone call, Pompa testified that she thought she made a mistake in LN's billing the day before. (Doc. 57-1, Pl. Ex. 1, Pl. Dep. 156:3-24). She did not consider that Merkert had changed the code. (Id.) At 12:18 PM, Pompa changed the billing for LN's therapy on December 13 to G0238, 4 units. (Doc. 45-30, Def. Ex. Z, E. Witkosky Email 12/19/2018). Rehus also testified that she billed LN using the G0238 code for 1:1 therapy on December 14, 2018, but

---

[16] From the evidence, the court can infer that Pompa was treating patients at the Gnaden campus that day.

did not recall whether she did it that day. (Doc. 57-3, Pl. Ex. 3, L. Rehus Dep. 44:6-25).

Against the backdrop of a human resources investigation into his conduct, Merkert admitted in his deposition that he "was spying" on the plaintiff regarding her use of the G0238 billing code. (Doc. 45-3, Def. Ex. B; Doc. 57-5, Pl. Ex. 5, 220:21–221:21).  On December 17, 2018, Merkert emailed Jennifer Stehman, in St. Luke's human resources department, and Erin Witkosky, in St. Luke's compliance department, about the billing reversals. (Doc. 45-19, Def. Ex. BB, W. Merkert Email 12/17/2018).  He accused Pompa of direct insubordination and stated that she put St. Luke's Medicare relationship in jeopardy. (Id.)  He also referenced Pompa's allegations against him. (Id.)  Based on these accusations, St. Luke's suspended and terminated Pompa.

After review of the broad array of evidence and testimony in this case, the motion for summary judgment will be denied.  Pompa has produced evidence that a reasonable jury could use to determine that St. Luke's reasons were fabricated.[17]  To the extent that Pompa did not follow Merkert's instructions, a

---

[17] As for assertions that Pompa acted unethically in using the G0238 code, the plaintiff has provided testimony from Mary Fulton and Linda Rehus to support her position.  Pompa has also supplied an expert report from a medical billing expert, who opines that the services the plaintiff provided to LN on December 13, 2018 were appropriately coded using G0238. (Doc. 57-23, R. Reier Report, p. 3).  Pompa's expert also opines that it was inappropriate for St. Luke's to reverse the code and change it to G0239. (Id., p. 9).

jury will have to decide what those instructions actually were, when they were provided, and the context in which they were provided, particularly after the plaintiff reported Merkert to human resources for age discrimination.  In other words, they must determine whether Pompa's conduct was only treated as insubordination after the plaintiff's protected activity.  In doing so, a jury will have to compare Pompa's conduct with Mary Fulton, who Merkert promoted, and Linda Rehus, who experienced no adverse employment action before her retirement.  A jury must also weigh whether the above timeline favors the plaintiff or favors St. Luke's.  They may find certain evidence innocuous or coincidental.  On the other hand, a jury may find that certain evidence highly suspicious and determine that Merkert and St. Luke's acted with retaliatory motives.

In Canada, the Third Circuit Court of Appeals explicitly rejected a rule of law that "incentivizes employers to dig up reasons to fire an employee who has engaged in protected activity, and then immunizes them from suit based upon a subsequent fortuitous discovery of grounds for termination." 49 F.4th at 349.  The evidence advanced by Pompa could support a conclusion that Merkert and St. Luke's went looking for something and/or intentionally created a situation that would justify terminating the plaintiff once she complained of age discrimination.  Under such circumstances, summary judgment is improper. See id. at 348–49

(discussing <u>Hobgood v. Illinois Gaming Bd.</u>, 731 F.3d 635, 637–46 (7th Cir. 2013)).  Consequently, St. Luke's motion for summary judgment will be denied.

**Conclusion**

For the reasons set forth above, St. Luke's motion for summary judgment (Doc. 44) will be denied.  An appropriate order follows.

Date: 5/23/25

_____
JUDGE JULIA K. MUNLEY
United States District Court

48